**UNITED STATES of America,**
**Plaintiff,**

v.

**Eugene Rayford PERRY et al.,**
**Defendants.**

**Crim. No. 12175.**

United States District Court,
S. D. California.

March 16, 1972.

Harry D. Steward, U. S. Atty., Thomas M. Coffin, Asst. U. S. Atty., San Diego, Cal., for plaintiff.

Wesley C. Blake, G. Archie Boster, Carmine J. Bua, Edward V. Brennan, Robert F. Bourne, Philip A. DeMassa, C. J. Carlson, San Diego, Cal., for defendants.

## MEMORANDUM DECISION AND ORDER

GORDON THOMPSON, Jr., District Judge.

The defendant, Ivan L. Glasscock, moves to suppress statements made and evidence obtained resulting from vehicle stops, conversations overheard in a motel room, and vehicle searches after his arrest. The defendants, Eugene Rayford Perry, Carl Phillip Green, and Donald Ralph Rice, move to suppress statements made and evidence obtained resulting from their arrest. The defendant, Edward James Fisch, moves to suppress conversations overheard in a motel room or, in the alternative, to dismiss the indictment. An evidentiary hearing was held on February 17 and 18, 1972, at the conclusion of which the matter was taken under submission by the Court.

## FACTS

On September 23, 1971, at approximately 6:40 P. M., before dusk, Arthur M. Tobin, a retired forestry ranger, noticed two flares burning in an open field about 100 feet from a highway. The field was private property and located about one mile south of Maritas Junction on Highway 79, and in the vicinity of Vulcan Mountain. There were two males present who identified themselves as Ivan Glasscock and Donald Thopy. They stated that they were having car trouble, specifically mentioning a flat tire. Two vehicles were parked nearby, a white Ford Van, California license number CUY–444, and a tan Volkswagen Sedan, Indiana license number 49X–5826. Neither vehicle appeared to Tobin to have a flat tire. This information was transmitted to Deputy Gene Cowley of the San Diego County Sheriff's office at about 9:30 A. M. the following morning.

On the same evening, just before dusk, Wayne and Larry King, independently witnessed a red and white airplane circling in the area of Vulcan Mountain. Two objects were seen to drop from the plane. The Kings informed Anthony Taylor of the drop, who in turn informed Deputy Cowley at approximately 9:00 A.M. the following morning (September 24, 1971).

On September 24, 1971, at 10:00 A. M., Deputy Cowley saw the Ford Van traveling slowly on a highway in the vicinity of the aircraft drop. The rear license plate was dirty and difficult to read and a tail light was defective. Cowley stopped the vehicle and verified the plate number as California license number CUY–444. The driver, Ivan Glasscock, had an Indiana driver's license and stated that the vehicle had been borrowed from a friend in Sacramento named James Knauss. The vehicle was detained approximately 20 minutes while a name check was performed by the sheriff's department. While awaiting the result of the name check, the driver consented to a search of the van. Under the right front seat was discovered an aerial navigation map. It was opened to display the Julian Vortac or Omni Station. A line was drawn in a westerly direction towards Highway 79

and intersecting the area of the suspected drop.

On September 24, 1971, the Kings reported their observations to immigration officers. A search of the area of the drop at about 9:30 A. M. resulted in the discovery of a duffle bag containing kilo bricks of marijuana. This information was passed to Deputy Cowley on the same day, but after he had stopped and released the Ford Van.

On September 26, 1971, Taylor found a second duffle bag containing kilo bricks of marijuana on Vulcan Mountain. During his search Taylor had met three unidentified males, who stated they were in the area fishing. He informed them they were trespassing on Indian land. The marijuana was delivered to Deputy Cowley who was also informed of the three strangers.

On September 28, 1971, Deputy Cowley stopped the Ford Van a second time in the area of the airplane drop. The license plate was still dirty and the tail light still defective. In response to Cowley's questions, the occupants of the vehicle, Glasscock and Thopy, stated they were staying at the Holiday Inn Motel in La Jolla. The suspects were released upon their promise to correct the vehicular deficiencies.

It was subsequently learned that Ivan Glasscock and Donald Thopy were staying at the Holiday Inn in the Mission Valley area of San Diego. A surveillance was conducted on September 28, 29 and 30, 1971. The defendants were occupying room 514. Sheriff's department detectives requested a room adjoining 514, but none was available. Rooms 506 and 508 were vacant. Therefore, a scheme was devised whereby the defendants were requested to change rooms from 514 to 506. They readily consented to a request by the manager that they change rooms. Officers stationed themselves in room 508 and were able to

hear, without the aid of artificial devices [1] incriminating conversations by Glasscock, Thopy and one Edward J. Fisch, who arrived after the surveillance was set up. The conversations contained many references to the "weed," the "stuff," "aircraft operations," "drug usage," etc., and may be summarized as a full admission of participation in a criminal smuggling venture. There was a telephone call by Glasscock to a "Don." The call indicated that three persons would arrive at the motel room early in the morning of September 30, 1971. Customs Agent Jerrold M. Kelly, present in room 508 during portions of the surveillance, knew that a "Don Rice" had been arrested along with Glasscock by U. S. Customs about a month earlier.

At approximately 9:20 P. M. on September 29, 1971, Glasscock, Thopy, and Fisch were arrested. At about 5:20 A. M. the following morning Donald R. Rice, Eugene R. Perry, and Carl P. Green arrived at room 506 and were also arrested. Vehicles belonging to the defendants and located in the motel parking lot were searched. Evidence was also seized from room 506. No evidence was presented that the evidence was not in plain view.

ISSUES

The issues raised are determined by the lawfulness of the following events: (1) the two stops of the Ford Van by Deputy Cowley, (2) the eavesdropping conducted from room 508, (3) the arrest of the defendants.

▮ Before considering the detentions, a general statement of the law is appropriate. Absent a federal statute, the validity of an arrest is determined by state law. United States v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948). Brief, informal detentions for a limited inquiry by peace officers are also governed by state law. Wartson v.

---

I. There was an attempt to use a suction cup electronic listening device. Apparently no significant evidence was gathered in this way because the device was inoperative and the conversations were overheard and understandable with the naked ear.

United States, 400 F.2d 25 (9th Cir. 1968), cert. denied, 396 U.S. 892, 90 S. Ct. 184, 24 L.Ed.2d 166 (1969). The test for such a detention is would the facts available to the officer at the moment of seizure warrant a man of reasonable caution in the belief that the action taken was appropriate. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L. Ed.2d 889 (1968). In determining the validity of an arrest or detention by state officers, *i. e.*, in determining whether or not there has been a compliance with state law and the federal constitution, courts may look to both state and federal cases. *Compare* Call v. United States, 417 F.2d 462 (9th Cir. 1969) *with* United States v. Blum, 432 F.2d 250 (9th Cir. 1970).

## THE FIRST STOP OF THE FORD VAN

■ The Court finds that the first stop and search of the Ford Van, license number CUY–444, was lawful and that all statements and evidence resulting from the detention are admissible. Deputy Cowley had the right to detain the vehicle and its occupants, Glasscock and Thopy, for at least two reasons. First, there was defective equipment on the van, namely an unreadable license plate, plus an inoperative stop light. Secondly, there was reason to believe that criminal activity was underway and that Glasscock and Thopy were connected with it. Cornforth v. Dept. of Motor Vehicles, 3 Cal.App.3d 550, 83 Cal.Rptr. 762 (1970). A limited detention and vehicular search for the purpose of investigation was reasonable under these circumstances. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). People v. Flores, 23 Cal.App.3d 23, 99 Cal.Rptr. 858 (1972). Furthermore, the driver voluntarily consented to the search.

## THE SECOND STOP OF THE FORD VAN

■ The Court finds that the second stop of the Ford Van was lawful and that all statements and evidence discov-ered as a result thereof are admissible. The defects in vehicular equipment appeared uncorrected. More importantly, Deputy Cowley now could be certain that criminal activity was underway because it had been reported to him that marijuana had been found in the sacks dropped by airplane. This new and critical information not only gave the officer the right to detain Glasscock and Thopy for the purpose of conducting a limited inquiry into their activities, but also, when added to what he already knew, gave him probable cause upon which an arrest could have been made.

## THE EAVESDROPPING

■ The Fourth Amendment protects people, not places. A person has a reasonable expectation of privacy no matter what his particular location. Governmental authorities may not invade that expectation absence exigent circumstances, without prior procurement of a warrant. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L. Ed.2d 576 (1967). The difficulty in many cases will be in determining precisely what was the reasonable expectation of privacy of the individuals concerned, taking into account their particular environment.

■ The general rule is that information obtained by an officer using his natural senses, where the officer has a right to be where he is, is admissible evidence. The fact that the information is in the form of conversations emanting from a private space, such as a hotel room, is not a bar to its admissibility. Ponce v. Craven, 409 F.2d 621 (9th Cir. 1969). Furthermore, the fact that it may be necessary to place one's ear against a door in order to comprehend the conversations inside a room does not make the search unlawful. People v. Guerra, 21 Cal.App.3d 534, 98 Cal.Rptr. 627 (1971).

■ Since it is the reasonableness of the conduct of the authorities that is in question, an unusual factor in this

case must receive special consideration. The suspects were purposefully moved (with the assistance of motel management) from their original room to one adjacent to investigating officers. This deception made the eavesdropping mission easier, for the original room occupied by the suspects did not have interconnecting doors to its adjacent rooms. Was this deceptive action so unreasonable as to violate the expectation of privacy of the occupants of room 506 in a constitutional sense? This Court thinks not.

Certainly it would have been lawful for officers to move into the room adjacent to the original one occupied by the suspects. It also would have been proper to have asked the motel management to place the suspects in a room adjacent to one occupied by the authorities when they first checked in. The only interest the suspects had in the motel was that they be placed in a typical room out of the many available. They had no right to the more "secure" of these rooms. The room to which they were moved was not altered in any way. The interconnecting doors were in plain view. The deception practiced by law enforcement officers in this case was only that so often required to detect and apprehend criminal suspects. This was not a game, but rather was serious business. The conduct of the officers was reasonable. United States v. Jones, 140 U.S.App.D.C. 70, 433 F.2d 1176 (1970), cert. denied, 402 U.S. 950, 91 S.Ct. 1613, 29 L.Ed.2d 120 (1971). The conversations overheard are admissible as to all parties.

## STANDING

Although the Court has determined that the conversations were not overheard as a result of unconstitutional action by law enforcement officers, and therefore, need not be suppressed, it may be appropriate to discuss briefly the standing issue.

 "In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must first be a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else. Rule 41(e) [Federal Rules of Criminal Procedure] applies the general principle that a party will not be heard to claim a constitutional protection unless he belongs to the class for whose sake the constitutional protection is given." Jones v. United States, 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697 (1960). Whether or not an individual is a "person aggrieved" so as to have standing to present a motion to suppress evidence obtained as a result of an unlawful search or seizure is a federal question. Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). Boyle v. United States, 395 F.2d 413 (9th Cir. 1968), cert. denied, 393 U.S. 1089, 89 S.Ct. 861, 21 L.Ed.2d 782 (1969).

 Thus, it is clear that the defendants Perry, Green and Rice have no standing to raise the issue of the legality of the eavesdropping.

## CONCLUSION AND ORDER

The vehicular detentions, eavesdropping, arrests and searches incident to the arrests, were lawful. The motions set out in the introductory portion of this opinion are denied.